ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| COOPERATIVA DE AHORRO Y CRÉDITO LAS PIEDRAS<br>Apelante<br><br>v.<br><br>MEDI FILMS INC. Y OTROS<br>Apelado | KLAN202500337 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Número: MZ2020CV01054<br><br>Sobre: Ejecución de Hipoteca: Propiedad Comercial |
|---|---|---|

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos

Rivera Marchand, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 24 de junio de 2025.

Comparece ante esta Curia, la Cooperativa de Ahorro y Crédito Las Piedras (Cooperativa) mediante el presente recurso de apelación y solicita que revoquemos la *Sentencia Parcial* que notificó el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI o foro primario), el 4 de diciembre de 2024. En su dictamen, el TPI declaró no ha lugar a la *Moción de Sentencia Sumaria Parcial* que instó la Cooperativa y con lugar la *Oposición a Moción de Sentencia Sumaria Parcial y Solicitud Para Que Se Dicte Sentencia Sumaria a Favor del Municipio Autónomo de Mayagüez* que presentó el Municipio Autónomo de Mayagüez (Municipio). En esta decretó la nulidad de la Escritura Número: Nueve (9) "Acta de Edificación y Transferencia de Titularidad" (Escritura Núm. 9) y de la Escritura Número: Cuarenta y Dos (42) "Hipoteca" (Escritura Núm. 42) y ordenó al Registrador de la Propiedad cancelar los asientos registrales correspondientes. Además, ordenó la desestimación de la causa instada contra el Municipio y Mayagüez Economic Development Inc. (MEDI).

Número Identificador

SEN2025_____

Por los fundamentos que discutiremos a continuación, revocamos la *Sentencia Parcial* apelada, a los únicos fines de dejar sin efecto la desestimación con perjuicio en cuanto a MEDI. Veamos.

**I.**

La causa de epígrafe se originó, el 2 de noviembre de 2020, con la *Demanda* sobre cobro de dinero, ejecución de gravámenes mobiliarios, ejecución de hipoteca, enriquecimiento injusto y acción rescisoria de venta en fraude de acreedores que instó la Cooperativa en contra de El Ojo de Dios, LLC; MEDI Films, Inc. (MEDI Films)[1]; MEDI[2]; Hipólito Avilés Vega (señor Avilés Vega); Jimmy López Torres, su esposa Elba Echevarría Díaz y la sociedad legal de gananciales por ellos compuesta (matrimonio López Echevarría); Thomas Commerton Olivieri (señor Commerton Olivieri); y Film Industry Logistics and Management Services, LLC.[3] El 6 de agosto de 2021, la *Demanda* fue objeto de enmienda a los fines de añadir como codemandados al Municipio y a los señores José Guillermo Rodríguez Rodríguez y Heriberto Acevedo Ruiz.[4]

Según expuso la Cooperativa, el 8 de febrero de 2017, MEDI Films le remitió una carta mediante la cual solicitó la concesión de una línea de crédito, por la suma de $10,000,000.00, para desarrollar películas y documentales. Informó ser subsidiaria de MEDI y ofreció como garantía del préstamo al Palacio de Recreación

---

[1] Mediante la Ordenanza Número 42 serie 2015-2016 de 27 de abril de 2016 la Legislatura Municipal de Mayagüez conforme la Ley núm. 149-2009 y la Ley núm. 181-2011 autorizó la creación de la corporación MEDI con fines de lucro para hacer negocios y administrar empresas en el área de producción de películas, documentales y distribuciones de éstos entre otras facultades. El alcalde de Mayagüez fungía como presidente de MEDI Films y el Vicealcalde era el vicepresidente.

[2] Mediante la Ordenanza Número 23 serie 2013-2014 de 18 de marzo de 2014 la Legislatura Municipal de Mayagüez conforme la Ley Núm. 149-2009 y la Ley Núm. 181-2011 autorizó la creación de la corporación MEDI con fines de lucro y el alcalde sería presidente de su Junta y el vicealcalde sería el vicepresidente.

[3] Apéndice, págs. 1-13.

[4] Apéndice, págs. 119-149. Cabe puntualizar que, mediante una *Sentencia Parcial,* notificada el 30 de marzo de 2022, el foro primario desestimó con perjuicio la causa de acción en contra del entonces alcalde de Mayagüez, José Guillermo Rodríguez Rodríguez, en su capacidad personal. Apéndice, págs. 332-334. De otra parte, mediante una *Sentencia Parcial,* notificada el 28 de octubre de 2024, declaró Ha Lugar la solicitud de desistimiento voluntario, sin perjuicio, en cuanto al señor Heriberto Acevedo Ruiz. Entrada Núm. 311 del Sistema Unificado de Manejo y Administración de Casos (SUMAC) del Poder Judicial.

y Deportes Germán "Wilkins" Vélez (Palacio de Mayagüez). El 5 de marzo de 2018, suscribió con El Ojo de Dios, LLC (en calidad de codeudor), MEDI Films (en calidad de codeudor), MEDI (en calidad de codeudor), el señor Avilés Vega (Director Ejecutivo de MEDI Films), el matrimonio López Echevarría y el señor Commerton Olivieri (estos últimos en calidad de garantizadores solidarios), un contrato de préstamo intitulado *Non-Revolving Line of Credit Loan Agreement.* Mediante el referido acuerdo, la Cooperativa otorgó una línea de crédito, no rotativa, a favor de El Ojo de Dios, LLC y de MEDI Films por la suma de $5,000,000.00. Lo antes, evidenciado por un Pagaré Operacional "Note", vencedero el 30 de septiembre de 2019, y con el fin de financiar la producción y culminación de la película *El Ojo de Dios*.[5]

Para garantizar el préstamo, MEDI entregó en prenda un pagaré hipotecario, por la suma de $10,000,000.00, garantizado con una hipoteca constituida sobre el Palacio de Mayagüez. La Cooperativa alegó que, en igual fecha, formalizaron la entrega del pagaré hipotecario mediante el *Mortgage Note Pledge and Security Agreement,* autenticado ante notario público.[6]

A su vez, el Ojo de Dios, LLC entregó en carácter prendatario, créditos contributivos (*Pledge And Assignment of Tax Credits Grant*) que le fueron concedidos por el Departamento de Desarrollo Económico y Comercio, bajo las disposiciones de la Ley Núm. 27-2011, Ley de Incentivos Económicos para la Industria Fílmica de Puerto Rico, 23 LPRA sec. 11001, *et seq.*, por la producción de la película *El Ojo de Dios*.

Surge de la demanda instada que la Cooperativa incluyó alegaciones adicionales sobre acciones fraudulentas, sobre el mal uso de concesiones y la venta a terceros sin autoridad en ley. Lo

---

[5] Apéndice, págs. 633-634.
[6] Apéndice, págs. 652-664.

antes, por no haber notificado a la Cooperativa que los créditos dados en garantía estaban pignorados, entre otras causas. Surge además que, Film Industry Logistics and Management Services, LLC entregó a la Cooperativa, en carácter prendario, la totalidad de su participación en MEDI Films, consistente en un 60% de las acciones comunes de la corporación (*Stock Pledge Agreement*). A su vez, el señor Avilés Vega y MEDI Films entregaron sus participaciones en El Ojo de Dios, LLC (*Membership Interest Participation Pledge Agreement*). Además, MEDI Films y El Ojo de Dios, LLC entregaron a la Cooperativa, en carácter prendario, su cuenta operacional y de reserva en la Cooperativa. Tanto los codeudores, como los garantizadores de la deuda, otorgaron una *Garantía Continua e Ilimitada* para sostener el negocio jurídico.

La Cooperativa resaltó en la *Demanda* que, con anterioridad, en particular el 18 de marzo de 2016, la Administración de Terrenos de Puerto Rico (Administración de Terrenos) aprobó la Resolución Núm. 1981 con el propósito de modificar las condiciones restrictivas de uso y permitir que el predio cedido al Municipio -mediante la Escritura Núm. 25- pueda utilizarse para instalaciones recreativas, deportivas o usos comerciales relacionados. Además, el 18 de noviembre de 2016, la Legislatura Municipal aprobó la Resolución Núm. 79 con el fin de autorizar, al alcalde o sus funcionarios, a otorgar junto a la Administración de Terrenos las modificaciones de condiciones restrictivas contenidas en la Escritura Núm. 25, en cuanto a las Parcelas E-8 y E-0.

La Cooperativa expuso que, el 31 de enero de 2017, el Municipio y MEDI otorgaron la Escritura Núm. 9 mediante la cual el Municipio cedió y transfirió a MEDI la titularidad de la Parcela E-6(1), Finca 32046, con sus edificaciones, entiéndase, el Palacio de Mayagüez. También se desprende que, el 16 de agosto de 2017, MEDI suscribió sobre el Palacio de Mayagüez, tanto el pagaré

hipotecario por la suma principal de $10,000,000.00, como la Escritura Núm. 42, constitutiva de la hipoteca, la cual fue inscrita en el Registro de la Propiedad. Sin embargo, la Escritura Núm. 9 y la Escritura Núm. 42 no fueron remitidas a la Oficina del Contralor, conforme exige el Artículo 1(a) de la Ley de Registros de Contratos, 2 LPRA sec. 97 (a). Expuso que, el 15 de septiembre de 2017, el Municipio solicitó a la Administración de Terrenos modificar las condiciones restrictivas de uso sobre la Finca 32046, impuestas mediante la Escritura Núm. 25 de 30 de diciembre de 1976. Tales condiciones restrictivas prohibían la segregación, venta, cesión y enajenación del inmueble.

La Cooperativa planteó que, poco después, el 16 de octubre de 2017, el Alcalde del Municipio suscribió el Acta Aclaratoria Núm. 4 y, con ello, atestiguó la autoridad para enajenar o gravar el Palacio de Mayagüez y ratificó la transferencia de la titularidad y el gravamen hipotecario sobre la Finca 32046, por medio de las Escrituras Números 9 y 42. Indicó, además, que la Legislatura Municipal también ratificó las Escrituras Números 9 y 42, el 21 de noviembre de 2017, a través de la Resolución Núm. 42.

Surge de la *Demanda Enmendada* que, el 7 de diciembre de 2017, la Administración de Terrenos aprobó la Resolución Núm. 2065 con el fin de liberar la Finca 32046 de la prohibición de enajenar. Se desprende, además, que la Administración de Terrenos y el Municipio otorgaron la Escritura Núm. 1, sobre *Modificación de Condiciones Restrictivas,* el 21 de febrero de 2018, con el fin de que conste en el Registro de la Propiedad la modificación a las condiciones restrictivas que gravan la Finca 32046.[7]

---

[7] Cabe señalar que, la Escritura Núm. 1 fue presentada en el Registro de la Propiedad, el 15 de marzo de 2018 e inscrita, el 10 de agosto de 2021. Según la Cooperativa, ni el Municipio, ni MEDI ni la Administración de Terrenos remitieron a la Oficina del Contralor de Puerto Rico copia de la referida escritura, en violación al Artículo 1 de la Ley de Registros de Contratos, 2 LPRA sec. 97(a).

En su súplica, la Cooperativa expuso que, el 30 de septiembre de 2019, venció el plazo que tenían los demandados de epígrafe para sufragar la cuantía adeudada, por concepto de principal e intereses sobre un negocio jurídico válido. Sobre tales bases, solicitó la ejecución de los gravámenes mobiliarios e hipoteca y reclamó el pago de $5,877,083.26, intereses, más el resarcimiento por los daños y perjuicios sufridos.

En su alegación responsiva, el Municipio levantó la nulidad de la hipoteca objeto de este recurso. Lo antes, sustentado en que, se otorgó en violación a las condiciones restrictivas impuestas sobre el inmueble hipotecado, las cuales prohibían que el mismo fuese enajenado, vendido, arrendado, cedido, transferido o utilizado por terceros.[8] Al mismo tiempo, el Municipio reconvino mediante una causa de acción sobre sentencia declaratoria que decrete la nulidad tanto de la transferencia de titularidad como de la hipoteca. Solicitó además que, a raíz del otorgamiento de la *Estipulación y Acuerdo Transaccional* (que suscribieron la Cooperativa, El Ojo de Dios, LLC, el señor Avilés Vega, el señor Commerton Olivieri, el matrimonio López Echevarría y Film Industry Logistics and Management Services, LLC) el Municipio no responde por la cuantía reclamada. A su entender, la reclamación instada en la *Demanda Enmendada* es prematura.

De otra parte, MEDI y MEDI Films contestaron la reclamación en su contra de forma conjunta.[9] Análogamente, invocaron la nulidad de la transacción objeto del presente litigio, bajo el fundamento de que, el Palacio de Mayagüez es un bien de dominio público, no susceptible de ser hipotecado, y que quien representó a MEDI y a MEDI Films en la transacción no ostentaba la autorización

---

[8] Apéndice, págs. 256-299. A modo de sintetizar, no haremos referencia a la *Contestación a la Demanda y Reconvención* instada antes de que la Cooperativa enmendara su demanda.

[9] Apéndice, págs. 300-313. Limitaremos la discusión a la alegación responsiva interpuesta en reacción a la *Demanda Enmendada*.

de sus correspondientes Juntas de Directores. En su reconvención, adujeron que todas las garantías otorgadas a favor de la Cooperativa son nulas debido a que esta última actuó de mala fe, mediante negligencia y en violación a su obligación fiduciaria. Añadieron que, su consentimiento estuvo viciado y que procede la desestimación de la causa por falta de parte indispensable. En su exposición, de forma general, indicaron que todas las partes con interés son todas las instituciones financieras y cooperativas participantes en el crédito que se reclama.

Surge del expediente que, a raíz de una *Estipulación y Acuerdo Transaccional* que suscribieron la Cooperativa, El Ojo de Dios, LLC, el señor Avilés Vega, el señor Commerton Olivieri, el matrimonio López Echevarría y Film Industry Logistics and Management Services, LLC, y por virtud de la *Sentencia Parcial*, notificada el 25 de junio de 2021, el pleito continuó únicamente en contra del Municipio, MEDI y MEDI Films.[10]

Superados los incidentes procesales de rigor, la Cooperativa instó una *Moción de Sentencia Sumaria Parcial* en la cual propuso ochenta y cuatro (84) hechos materiales sobre los cuales entiende que no existe controversia.[11] En apretada síntesis, la Cooperativa

---

[10] Apéndice, pág. 112.

[11] Apéndice, págs. 374-460. Junto a su petitorio incluyó los siguientes documentos: Anejo 1-Certificado de Organización de El Ojo de Dios, LLC; Certificado de Registro a Medi Films; Certificado de Registro del Mayagüez Economic Development, Inc.; Ordenanza Núm. 23 de 18 de marzo de 2014; Ordenanza Núm. 25 de 24 de marzo de 2014; Ordenanza Núm. 27 de 7 de abril de 2014; Anejo 2-Acta Notarial Núm. 4 de 16 de octubre de 2017; Escritura Núm. 9, Acta de Edificación y Transferencia de Titularidad; Resolución de MEDI de 27 de enero de 2017; Resolución de MEDI de 11 de diciembre de 2017; Anejo 3-Historial del Asiento 2017-012412-MY01; Certificación Registral Finca 32046; Ordenanza Número 42 de 27 de abril de 2016; Resolución Corporativa de MEDI Films de 10 de mayo de 2017; Resolución Corporativa de MEDI Films de 15 de agosto de 2017; Resolución Corporativa de MEDI de 15 de agosto de 2017; Pagaré Hipotecario por la suma principal de $10,000,00.00; Escritura de Hipoteca Núm. 42; Anejo 4-Escritura Núm. 3, Acta de Subsanación; Historial del Asiento 2017-092172-MY01; Resolución Núm. 42 de 21 de noviembre de 2017; Resolución Núm. 2065 de 7 de diciembre de 2017; Escritura Núm. 25 de 30 de diciembre de 1976; Escritura Núm. 1 de Modificación de Condiciones Restrictivas; Historial del Asiento 2018-022256-MY01; Carta de MEDI Films a la Cooperativa de 8 de febrero de 2017; Carta de la Cooperativa a MEDI Films de 29 de agosto de 2017; Anejo 5-Non Revolving Line of Credit Loan Agreement (Ojo de Dios); Pagaré Operacional (Note) de 5 de marzo de 2018 por $5,000.00; Certificado de Organización de Dos Caminos LLC; Contrato de Préstamo Comercial (Dos Caminos); Anejo 6-Pagaré de Bóveda de 25 de octubre de 2018; Mortgage Note Pledge and Security Agreement

arguyó que el Palacio de Mayagüez es un bien patrimonial municipal -no un bien de dominio público- susceptible de enajenación y gravamen, y que el traspaso y la hipoteca constituida sobre el Palacio de Mayagüez fue válida y legalmente ejecutable. A su entender, mediante la Resolución Núm. 42, la Legislatura Municipal ratificó la transferencia de titularidad del Palacio de Mayagüez (Escritura Núm. 9), la constitución de la hipoteca sobre el Palacio de Mayagüez (Escritura Núm. 42), y el Acta Aclaratoria Núm. 4 en donde se narra el proceso de transferencia y financiamiento del Palacio de Mayagüez. Sostuvo que, a través de la Resolución Núm. 79 que aprobó la Legislatura Municipal, quedaron autorizadas las modificaciones a las condiciones restrictivas de la Parcela E-6(1).

---

(Ojo de Dios); Contrato de Prenda Pagaré de Bóveda (Obligacional) (Dos Caminos); Carta de 21 de diciembre de 2017 del Lcdo. Arnaldo Irizarry al Sr. Edgar López Román; Carta de 4 de abril de 2017 de MEDI a MEDI Films; Cartas de Declaración de Incumplimiento de 4 de agosto de 2020; Anejo 7-Contestación de Heriberto Acevedo a Requerimiento de Producción de Documentos del Municipio de Mayagüez; Minuta MEDI Reunión de 4 de septiembre de 2015; Carta de 11 de agosto de 2017 de Hipólito Avilés Vega a Alcalde José G. Rodríguez; Carta de 11 de agosto de 2017 de Lcdo. Arnaldo Irizarry a Alcalde José G. Rodríguez; Certificación de Resolución Corporativa de MEDI de 15 de agosto de 2017; Minuta MEDI de Reunión de 26 de agosto de 2016; Carta de 28 de octubre de 2016 de Lcdo. José Clemente González a Alcalde José G. Rodríguez; Carta de 18 de noviembre de 2016 de Lcdo. José Clemente González a Roberto Mejil; Correo electrónico de Alejandro Riera de 25 de enero de 2017 a Alcalde José G. Rodríguez; Carta de Alejandro Riera de 25 de enero de 2017 a Alcalde Rodríguez; Carta de 27 de enero de 2017 de Lcdo. José Clemente González a Lcdo. Arnaldo Irizarry y borrador de escritura de Acta de Edificación y Transferencia de Titularidad; Minuta de MEDI de Reunión de 28 de abril de 2017; Contrato de Prenda de Pagaré Hipotecario (Dos Caminos); Declaración Jurada Certificación de deuda; Certificación registral de 8 de enero de 2024; Anejo 8-Contrato uso Palacio de los Deportes West Sports & Social Indios de Mayagüez BSN 2023; y Anejo 9-Contrato uso Palacio de los Deportes Fundación Deportiva Indios de Mayagüez Liga de Voleibol 2023. Posterior a ello suplementó su petitorio sumario para incluir los siguientes documentos: Anejo 1-Índice del apéndice de la *Moción de sentencia sumaria*; Anejo 2-Eficacia de prohibiciones de disponer voluntarias por Ana Cañizares Lazo, Profesora Titular de Derecho Civil; Anejo 3-Código Civil Documentado Volumen II por Ana Cañizares Lazo, Profesora Titular de Derecho Civil; Anejo 4-Las Prohibiciones de Disponer en el Derecho Español por Francisco Javier Gómez Gálligo, págs. 1-117; Anejo 5-Las Prohibiciones de Disponer en el Derecho Español por Francisco Javier Gómez Gálligo, págs. 118-225; Anejo 6-Las Prohibiciones de Disponer en el Derecho Español por Francisco Javier Gómez Gálligo, págs. 226-269; Anejo 7-Efectos Reales Y Obligacionales De Las Prohibiciones De Disponer Voluntarias En El Ordenamiento Jurídico Español; Anejo 8-Fundamentos del Derecho Civil Patrimonial III de Luis Díez Picazo; Anejo 9-Manuel Albaladejo García, Catedrático de Derecho Civil, Artículo 785; Anejo 10-Derecho Hipotecario, Tomo V de Ramón M. Roca Sastre, págs. 617-637; Anejo 11-Derecho Hipotecario, Tomo V de Ramón M. Roca Sastre, págs. 638-659; Anejo 12-Derecho Hipotecario, Tomo V de Ramón M. Roca Sastre, págs. 660-680; Anejo 13-Código Civil de España de 1889; Anejo 14-Ley Hipotecaria de España de 1946; Anejo 15-Sentencia del Tribunal Supremo de España de 5 de abril de 1934; Anejo 16-Sentencia del Tribunal Supremo de España de 12 de mayo de 1999; Anejo 17-Sentencia del Tribunal Supremo de España de 30 de diciembre de 2011; Anejo 18-Resolución de 25 de junio de 2013 de la Dirección General de los Registros y del Notariado; Anejo 19-Resolución de 20 de julio de 2022 de la Dirección General de Seguridad Jurídica y Fe Pública; y Anejo 20-Real Decreto 139-2020.

Finalmente, arguyó que es nula la prohibición de enajenar que impuso la Administración de Terrenos sobre la Finca 32046, por medio de la Escritura Núm. 25 de 30 de diciembre de 1976, por su carácter perpetuo.

A lo antes, se opusieron MEDI, MEDI Films y, separadamente, el Municipio.[12] En su oposición, MEDI y MEDI Films argumentaron que existe controversia en cuanto a los eventos, validez y legalidad del traspaso de la Parcela E-6(1) y del Palacio de Mayagüez que impiden la solución sumaria de este asunto, sin someter documentos que sustenten su postura. Al oponerse, el Municipio propuso cuarenta y cuatro (44) hechos adicionales que, a su entender, no están en controversia.[13] Solicitó la denegatoria al petitorio sumario de la Cooperativa, bajo el fundamento de que, no proceden sus reclamos. Sustentó su propio petitorio sumario en la ausencia de hechos medulares en controversia que impidan decretar sumariamente la nulidad de las Escrituras 9 y 42, y ordenar al Registrador de la Propiedad cancelar sus correspondientes asientos registrales.

Justipreciado lo antes, y tras bifurcar los procedimientos previamente consolidados, a los fines de atender como cuestión de umbral, la validez y legalidad del traspaso de la Parcela E-6(1) del Municipio a MEDI, para acelerar los procedimientos y facilitar la más pronta terminación del litigio,[14] el foro primario dictó el

---

[12] Apéndice, págs. 1615-1618 y 1619-1823, respectivamente.

[13] Con su Oposición, el Municipio incluyó los siguientes documentos: Anejo 1-Escritura núm. 25 de Segregación, Cesión y Traspaso Mediante Donación; Anejo 2-Certificación de Propiedad Inmueble emitida por el Departamento de Justicia; Anejo 3-Ordenanza Número 23; Anejo 4-Ordenanza Número 25; Anejo 5-Ordenanza Número 27; Anejo 6-Ordenanza Número 42; Anejo 7-Resolución Número 1981-revisada; Anejo 8-Resolución Número 79; Anejo 9-Escritura Número Nueve, Acta de Edificación y Transferencia de Titularidad; Anejo 10-Estudio de Título; Anejo 11-Primer Pliego de Interrogatorios y Requerimiento de Admisiones; Anejo 12-Contestación a Requerimiento de Admisiones; Anejo 13-Escritura Núm. 42 Escritura de Hipoteca; Anejo 14-Estudio de Título; Anejo 15-Resolución Número 42; Anejo 16-Resolución Número 2065; Anejo 17-Escritura Número 1 Modificación de Restricciones. Apéndice, págs. 1619-1823.

[14] Cabe señalar que, el 15 de octubre de 2021, el foro primario notificó una *Resolución* consolidando el caso de epígrafe con el caso Núm. MZ2021CV00099, *Cooperativa de Ahorro y Crédito Las Piedras v. Dos Caminos, LLC, et al.,* por entender que ambos presentan un núcleo de hechos relacionados al

pronunciamiento impugnado, en el cual consignó las siguientes determinaciones de hechos:

1. El 30 de diciembre de 1976, la Administración de Terrenos de Puerto Rico ("**Administración de Terrenos**") y el Municipio otorgaron la Escritura Núm. 25 de Segregación, Cesión y Traspaso mediante Donación ante el Notario Público Rafael F. Arrillaga ("**Escritura 25**"), que fue inscrita en el Registro de la Propiedad.

2. En el expositivo Primero de la Escritura 25, se exponen las descripciones registrales de 4 parcelas que fueron segregadas de la Finca 2505, las cuales se identifican como las Parcelas "A y B", "E-0", "E-8" y "E-6".

3. En el expositivo Segundo de la Escritura 25, la Administración de Terrenos solicita que se segreguen 6.11589 cuerdas, de la Parcela "E-6" y solicitan al Registrador que la inscriba como un cuerpo separado e independiente, con numeración propia. Al segregar esas 6.11589 cuerdas segregadas de la "E-6" se creó la Parcela "E-6(1)".

4. La PARCELA E-6(1) es la Finca número 32,046 en el Registro de la Propiedad, Sección de Mayagüez y su descripción es:

   > RUSTICA: Predio de terreno con cabida de seis cuerdas con once mil quinientos ochenta y nueve (6.11589 cdas.), equivalente a dos (2) hectáreas, cuarenta (40) áreas y treinta y siete, punto, ocho mil seiscientos setenta y tres (38.8673) centiáreas, sito en el Barrio Miradero de Mayagüez, colindando: por el Norte, con la finca principal de la cual se segrega; por el Sur, con varios dueños, con las Calles Almendares, California, Sanjurjo; Cruz Roja, Pabón Maristani, con solar de Alfredo Seda Vázquez y prolongación de la calle Dr. Escabí; por el Este, con la finca principal de la cual se segrega; y por el Oeste, con la Calle Luna.

5. En el expositivo Tercero de la Escritura 25, la Administración de Terrenos cede al Municipio de Mayagüez, por donación, la titularidad de las parcelas "A y B", "E-7", "E-0" y la "E-6(1)".

6. La Administración de Terrenos le impuso al Municipio ciertas condiciones restrictivas sobre las parcelas donadas y cuya titularidad se traspasó al segundo, a saber:

   > [...] CUARTO: Los terrenos aquí donados se destinarán, total y exclusivamente, para los propósitos de proveer facilidades recreativas, tal y como se contemplan en el proyecto "Parque de los Próceres Puertorriqueños" y la PARCELA "A y B" para terminal de vehículos y/o garajes municipales.
   > QUINTO: Las parcelas de terreno aquí donadas no podrán, en modo alguno, ser segregadas, enajenadas, vendidas, arrendadas, cedidas o de forma alguna transferidas o usadas por terceras personas. [...]
   > SÉPTIMO: "La Donataria" realizará las obras contempladas dentro de un término razonable y cumplirá cabalmente con los requisitos impuestos, tanto por la Junta de Planificación y los otros que ésta pueda imponer en su día, así como cualquier otra agencia gubernamental que corresponda. Queda entendido, asimismo, que de "La Donataria" dejar de cumplir cualquiera de tales requisitos, así como de los

---

financiamiento que proveyó la Cooperativa para la producción de unas películas y a la validez de unas garantías y contratos suscritos a esos efectos, entre las cuales se encuentra el Palacio. Sin embargo, el 3 de junio de 2024, y a solicitud del Municipio, el TPI bifurcó los procesos, al amparo de la Regla 38.2 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 38.2.

señalados en este Instrumento, "La Donante" se reserva el derecho de revisión. [...]

7. El 18 de marzo de 2014, y mediante la Ordenanza Número 23, Serie 2013-2014, ("Ordenanza 23"), la Legislatura Municipal del Municipio ("Legislatura Municipal") autorizó la creación de la corporación municipal MEDI como una corporación con fines de lucro, a tenor con la Ley 81.

8. Aun cuando la Ordenanza 23 autorizó al Municipio "a realizar las transferencias de activos y propiedades que fuesen necesarias para llevar a cabo cualquier actividad a estos fines", en la misma no se identificó, en forma alguna, a qué propiedades o activos se refería.

9. El 24 de marzo de 2014, la Ordenanza 23 fue enmendada por la Ordenanza 25, Serie 2013-2014 ("Ordenanza 25"). Dicha Ordenanza tampoco identificó, en forma alguna, propiedades o activos que el Municipio pudiese transferir a MEDI.

10. El 7 de abril de 2014, la Legislatura Municipal aprobó la Ordenanza Núm. 27, Serie 2013-2014 ("Ordenanza 27") que, en su parte pertinente, dispone:

> Sección 1ra. - Autorizar al Alcalde del Municipio Autónomo de Mayagüez y/o a los funcionarios en que este delegue, a realizar toda clase de negociaciones y transacciones que fueren necesarias para el desarrollo socioeconómico del Municipio Autónomo de Mayagüez en aras del cumplimiento con la presente Ordenanza.
>
> Sección 2da. - Se autoriza a su vez al Alcalde y/o a los funcionarios en que este delegue a otorgar todos aquellos acuerdos y/o contratos necesarios y que entiendan convenientes en la consecución de los propósitos señalados, por lo que se facultan y autorizan a otorgar todo tipo de contratos o cuasi contratos, ya sean públicos o privados, donde se pueda enajenar los bienes, vender, transferir, segregar predios, constituir servidumbres, hipotecar, subordinar hipotecas, [...] y a otorgar todos aquellos documentos necesarios para dar cumplimiento con la presente Ordenanza, en beneficio de la Corporación "Mayagüez Economic Development, Inc.".
>
> Sección 3ra. _. Autorizar al Alcalde del Municipio Autónomo de Mayagüez y/o a los funcionarios que este delegue a realizar las transacciones necesarias para el desarrollo socioeconómico de nuestra Ciudad como lo son las negociaciones, ventas, arrendamientos y/o enajenación, otorgamiento de y constitución de escrituras, liberación de condiciones resolutorias, segregación de predios, constitución de servidumbres y subordinación de hipoteca y derecho de retracto y/o aquellos otros documentos públicos o privados, [...] y cualesquiera otras servidumbres y documentos que sean necesarios.

11. En la Ordenanza 27 tampoco se identificó, en forma alguna, las propiedades o activos que el Municipio pudiese transferir a MEDI.

12. Cuatro días después de aprobada la Ordenanza 27, el 11 de abril de 2014, MEDI se incorporó como corporación municipal en el Registro de Corporaciones del Departamento de Estado de Puerto Rico.

13. El 4 de septiembre de 2015, la Junta de Directores del MEDI nombró al Sr. Alejandro J. Riera Fernández como su Director Ejecutivo.

14. A solicitud del Municipio, este Tribunal toma conocimiento judicial que el 22 de marzo de 2021, el Gobierno de los Estados Unidos presentó un Pliego Acusatorio Federal o "Indictment" y radicó cargos criminales federales contra el Sr. Alejandro J. Riera Fernández, entre otros, por haber creado un esquema, junto con otras personas, para

apropiarse ilegalmente de fondos públicos municipales, a través de MEDI. Asimismo, se toma conocimiento judicial que, el 9 de noviembre de 2022, un jurado federal encontró culpable al Sr. Alejandro J. Riera Fernández por participar en el esquema de fraude de $9 millones en detrimento del Municipio, así como por fraude electrónico a una institución financiera y lavado de dinero. Véase, *United States of America v. Eugenio García Jiménez, et als.*, Criminal No. 21-082 (AOC).

15. El 8 de marzo de 2016, la Administración de Terrenos aprobó la Resolución Núm. 1981 ("Resolución 1981") de la que se desprende que el Municipio le solicitó a la primera:

> […] que se modifiquen las condiciones restrictivas, de modo que el inmueble pueda desarrollarse para el mayor beneficio y bienestar de la ciudad, promoviéndose su desarrollo planificado. En una carta del 3 de marzo de 2016, el Municipio indica que la propiedad continuará siendo utilizada de forma y manera similar al uso dispuesto en sus orígenes, pero pide se flexibilicen las condiciones de uso impuestas en la Escritura Núm. 25.
>
> Por cuanto, en conversaciones tenidas con el Municipio para discutir con más detalle el objetivo de su carta, han confirmado que al momento sólo vislumbran seguir aprovechando la propiedad cedida para instalaciones recreativas y deportivas, así como, a lo sumo, para ciertos usos comerciales relacionados a las mismas, como acuerdos con concesionarios o pequeños negocios que se establezcan en el lugar.
>
> Por cuanto, dedicar la propiedad a instalaciones recreativas, deportivas o usos comerciales relacionados, según propone el Municipio, resulta adecuado y va acorde con las consideraciones de planificación urbana del área, además de representar potenciales proyectos de desarrollo económico para el lugar. Igualmente, el predio cedido por la Administración al Municipio en el 1976 ha sido debidamente utilizado y aprovechado, según su uso permitido y por ende se cumplieron los propósitos que dieron lugar a esa transacción. En este sentido, la solicitud del Municipio implica o posibilita el mayor desarrollo y utilización del predio cedido entonces.
>
> Por cuanto, el Director Ejecutivo solicita a la Junta de Gobierno que autorice modificar las condiciones restrictivas de uso que rigen el predio cedido mediante la referida Escritura Núm. 25, para permitir que en adelante la propiedad pueda ser utilizada para usos instalaciones recreativas, deportivas o usos comerciales relacionados.
>
> Por tanto, Resuélvase por la Junta de Gobierno de la Administración de Terrenos modificar las condiciones restrictivas de uso que rigen el predio cedido mediante la referida Escritura Núm. 25, conforme a los términos y condiciones mencionados. Además, se autoriza al Director Ejecutivo a otorgar todos los instrumentos legales necesarios para formalizar la referida modificación.

16. El 27 de abril de 2016, la Legislatura Municipal aprobó la Ordenanza Núm. 42, Serie 2015-2016, autorizando la creación de la corporación con fines de lucro, MEDI Films, Inc.

17. El 18 de noviembre de 2016, la Legislatura Municipal aprobó la Resolución Núm. 79, Serie 2016-2017 ("Resolución 79"), para autorizar al alcalde o al funcionario que éste designe, a otorgar con la Administración de Terrenos, la escritura de modificación de condiciones restrictivas de las Parcelas "E-8" y "E-0", contenidas en la Escritura 25. Dicha Resolución

no menciona, ni autoriza la modificación para la Parcela "E-6(1)," que es donde ubica el Palacio.

18. El 31 de enero de 2017, el Municipio de Mayagüez y MEDI, comparecieron en la Escritura Núm. 9 sobre Acta de Edificación y Transferencia de Titularidad ("Escritura 9"), autorizada por el notario público, José Clemente González Ortiz, en Mayagüez, Puerto Rico, para inscribir a favor del Municipio, las edificaciones que fueron construidas por el Municipio en la Parcela "E-6(1)" las cuales fueron valoradas en $14,770,200.00 y, luego de la inscripción, solicitaron el traspaso de la finca con sus edificaciones a favor de MEDI.

19. De conformidad con la Escritura 9, el Municipio construyó en la PARCELA E-6(1), el Palacio de Recreación y Deportes Germán "Wilkins" Vélez, inaugurado en el año 1980, que se describe de la siguiente forma en el Registro de la Propiedad, como parte de la descripción del terreno:

> ---Enclava sobre dicho terreno una estructura conocida como Palacio de Recreación y Deportes Ia que se describe a continuación: Construcción deportiva de forma octagonal construida en cemento y bloque que cubre un área de cuarenta y un mil ochocientos setenta y ocho pies cuadrados (41,878) con un área de capacidad para cinco mil quinientos (5,500) espectadores, un área de tarima exterior dedicada a espectáculos públicos y contando con las facilidades que se detallan a continuación:
> ---(1). Vestíbulo — Cuadrante A.
> ---(2) Elevador que lleva al segundo piso a la Casa Club Cuadrante A.
> ---(3) Elevador Casa Club-Cuadrante A.
> ---(4) Cuarto de maquinaria de los elevadores.
> ---(5) Baño de caballero — Cuadrante B.
> ---(6) Cuarto de almacén-Cuadrante H.
> ---(7) Oficina Administrativa — Cuadrante H.
> ---(8) Pasillo.
> ---(9) Ventanilla de taquillas.
> ---(10) Salón de conferencia-Cuadrante H.
> ---(11) Cocina número 2- Cuadrante B.
> ---(12) Área de servicio número 1-Cuadrante B.
> ---(13) Cocina número 2 —Cuadrante B.
> ---(14) Área de Servicio numero 2 cuadrante B.
> ---(15) Baño de caballeros — Cuadrante B.
> ---(16) Cuarto de almacén.
> ---(17) Baño de damas-Cuadrante D.
> ---(18) Baño para equipo visitante —Cuadrante D.
> ---(19) Baño para Árbitros.
> ---(20) Vestíbulo - Cuadrante G.
> ---(21) Cuarto de electricidad.
> ---(22) Baño para equipo local — Cuadrante F.
> ---(23) Baño de dama — Cuadrante F.
> ---(24) Vestíbulo —Cuadrante G.
> ---(25) Cuarto de Conserje.
> ---(26) Vestuario — Cuadrante G N I C
> ---(27) Escenario exterior — Cuadrante G-N I C
> ---(28) Oficina del Alcalde — Cuadrante H-N I C.
> ---(29) Salón de conferencias-Cuadrante H.
> ---(30) Vestíbulo — Cuadrante C.
> ---(31) Baño del Alcalde — Cuadrante H.
> ---(32) Bario-Cuadrante H.
> ---(33) Vestíbulo — Cuadrante C.
> ---(34) Corredor perimetral.
> ---(35) Cancha de Volibol.
> ---(36) Cuarto de Conserje.
> ---(37) Escaleras del s[ó]tano.
> ---(38) Escaleras número 2 — Cuadrante B.
> ---(39) Escaleras número 3 — Cuadrante D.
> ---(40) Escalera norte — Cuadrante A.

---(41) Escalera este — Cuadrante C.

---(42) Escalera sur— Cuadrante E.

---(43) Rampa y escalera — Cuadrante G- N I C.

---(44) Escalera número 4 — Cuadrante F.

---(45) Escalera número 1- Cuadrante H.

---(46) Escalera que conduce al segundo piso Cuadrante A-N IC.

---(47) Plan de entrada — Cuadrante A.

---(48) Baño N I C.

---(49) Área de banco de equipo visitante

---(50) área de banco de equipo local.

---(51) área oficial de juego.

---(52) Área de miembros de la prensa.

---(53) Rampa da suelo elevado.

---(54) Peldaños de madera.

---(55) Línea de boletos.

---(56) Área de fuentes de agua.

---(57) Área de comunicación.

---(58) Asientos escalonados.

---(59) Enfermería

---(60) Habitaciones de sistema de control.

---(61) Armario de transformador eléctrico.

----Enclavan además otras construcciones una dedicada a deportes y otra a estacionamiento las que se describen a continuación:

----A. Construcción de cemento y bloque con un área de construcción de dieciséis mil seiscientos setenta pies cuadrados (16,670 p/c) dedicada a deportes localizado contiguo al edificio principal del Palacio de Recreación y Deportes previamente descrito.

---B. Área de construcción de ochenta y cuatro mil doscientos cuarenta pies cuadrados (84,240 p/c) de cemento y bloque que se encuentra dividido en un primer piso soterrado y tres (3) pisos dedicados a estacionamientos, sirviendo el techo del área de estacionamiento soterrado como parte de una plazoleta que a su vez sirven de estacionamiento y área de actividades que da frente a la plazoleta de actividades públicas.

20. La Escritura 9 se otorgó sin haberse liberado las condiciones restrictivas impuestas por la Administración de Terrenos sobre la Parcela "E6(1)", entre las que destaca la prohibición de enajenar, prohibición de traspasar a terceros—como sería MEDI.

21. La Escritura 9 fue presentada el 4 de febrero de 2017, a las 11:24 am, ante el Registro de la Propiedad, Sección de Mayagüez.

22. El 26 de julio de 2017, Centurion Title Search, Inc., ("Centurion") emitió un Estudio de Título para la Cooperativa relacionado con la Finca Número 32,046, inscrita al folio 264 del tomo 1057 de Mayagüez, Registro de la Propiedad de Puerto Rico, Sección de Mayagüez, Parcela E-6(1), del cual se desprende que la referida parcela "consta inscrito a favor de Municipio de Mayagüez, quien adquiere por cesión a [sic] la Administración de Terrenos de Puerto Rico, por el precio (no expresa), mediante escritura número 25, otorgada en San Juan, el 30 de diciembre de 1976, ante Rafael J. Arrillaga e inscrita al folio 264 del tomo 1057 de Mayagüez, finca número 32046, inscripción 1a." En cuanto a las cargas y gravámenes, el Estudio de Título de Centurion dispone "por su procedencia: libres de cargas. Por sí: libres de cargas."

23. El 16 de agosto de 2017, MEDI, representada por Alejandro J. Riera Fernández, suscribió un Pagaré Hipotecario, vencedero a la presentación, por la suma principal de $10,000,000.00 a favor de la Cooperativa o a su orden, cuya firma fue autenticada, mediante el afidávit número 13,935 del notario público José J. Belén Rivera. Sin embargo, al

momento de suscribir el referido pagaré, aún estaban vigentes las condiciones restrictivas sobre la Parcela "E-6(1)" que garantizaba el pagaré, las cuales no habían sido liberadas por la Administración de Terrenos. La Cooperativa es la tenedora del Pagaré Hipotecario y mantiene el mismo [en] su posesión.

24. El 16 de agosto de 2017, mediante la Escritura Núm. 42 de Hipoteca ("Escritura 42"), MEDI hipotecó la PARCELA E-6(1) y el Palacio a favor de la Cooperativa, la cual fue autorizada por el notario público José J. Belén Rivera. Dicha escritura no hace referencia a estudio de título alguno, ni certificación registral, que la Cooperativa haya solicitado para corroborar el estado registral de la Finca 32046 (equivalente a la Parcela "E-6(1)"); la cual fue presentada ante el Registro de la Propiedad, el 16 de agosto de 2017, al Asiento 2017-092172-MY01 de Karibe.

25. En la Escritura 42 se incluyó la descripción registral del Palacio y la Finca 32046 y así indica en la sección de "CARGAS Y GRAVÁMENES: Por su procedencia y por sí: Libre de Cargas."

26. El 15 de septiembre de 2017, el Municipio solicitó a la Administración de Terrenos que modificara las condiciones restrictivas que gravaban los terrenos que le fueron donados mediante la Escritura 25, según tales condiciones emanaban de esa escritura.

27. El 21 de noviembre de 2017, la Legislatura Municipal aprobó la Resolución Núm. 42, Serie 2017-2018 ("Resolución 42"), por virtud de la cual la Legislatura Municipal resolvió:

Sección 1ra. - Se ratifica la Escritura Número 9 del 31 de enero de 2017 otorgada ante el Notario, Lcdo. José Clemente González Ortiz, donde se transfiere la propiedad inmueble descrita en dicha Escritura conocida como Palacio de Recreación y Deportes Germán "Wilkins" Vélez, a todos sus efectos y libre de toda restricción, condición o limitación.

Sección 2da. - Se ratifica la Escritura Número 42, sobre Hipoteca del 16 de agosto de 2017, otorgada ante el Notario, Ledo. José J. Belén Rivera, en donde se constituye una hipoteca sobre dicha propiedad para garantizar un financiamiento a favor de la Corporación Municipal y el Municipio de Mayagüez.

Sección 3ra. - Se ratifica el Acta Aclaratoria Número 4 del 16 de octubre de 2017, otorgada ante el Notario, Lcdo. Carlos E. Ortiz Collado, por el Honorable José Guillermo Rodríguez, Alcalde de la Ciudad de Mayagüez y Presidente de Mayagüez Economic Development, Inc., en donde notarialmente se hace narrativo de todo el proceso de transferencia del Palacio de Recreación y Deportes de Mayagüez denominado Germán "Wilkins" Vélez, así como todo el proceso de financiamiento para la obtención de los fondos en beneficio de nuestro Municipio.

Sección. 4ta. - Para dejar consignado con toda claridad que la Resolución Número 79, Serie 2016-2017, aprobada por esta Legislatura Municipal dispone que se autoriza al Honorable Alcalde o a cualquier Funcionario designado por éste la transferencia de la propiedad de las Parcelas E-8 y E-0, conocida como Palacio de Recreación y Deportes de Mayagüez Germán "Wilkins" Vélez y todos sus terrenos relacionados y así denominados, sin ningún tipo de restricción, condición o limitación.

28. El 7 de diciembre de 2017, la Junta de Gobierno de la Administración de Terrenos de Puerto Rico, emitió de manera unánime, la Resolución Número 2065, la cual fue certificada el 11 de enero de 2018, por su Secretaria, a través de la cual se consignó, que dicha Junta aprobó en lo pertinente lo siguiente:

El 30 de diciembre de 1976, mediante la Escritura Núm. 25 de Segregación, Cesión y Traspaso Mediante Donación, la

Administración de Terrenos de Puerto Rico ("Administración") cedió al Municipio de Mayagüez ("Municipio") un predio de 20 cuerdas de terreno ubicado en el Barrio Río y el Barrio Miradero de ese mismo pueblo. Esta transacción fue aprobada por esta Junta de Gobierno mediante la Resolución Núm. 441 de 29 de noviembre de 1976. El predio fue donado con el fin de construir el proyecto "Parque de los Próceres Puertorriqueños", así como un terminal de vehículos y/o un área de garajes municipales.

Por Cuanto, en la referida Resolución Núm. 441, la Junta de Gobierno dispuso expresamente que la escritura de transferencia del predio contendría todas las condiciones que el Director Ejecutivo estimara conveniente para salvaguardar el interés de la Administración, así como el interés público en general. Según requerido entonces, en la Escritura Núm. 25 se establecieron ciertas condiciones restrictivas de uso, así como un derecho de reversión del título a favor de la Administración, en caso [de] que las obras contempladas no fueran realizadas por el Municipio dentro de un término razonable de tiempo. En cuanto las condiciones restrictivas de uso, se estableció que el predio donado sería destinado total y exclusivamente para el propósito de proveer facilidades recreativas, específicamente el proyecto Parque de los Próceres Puertorriqueños. Asimismo, cierta porción sería para la construcción de un terminal de vehículos y/o garajes municipales. Igualmente, se dispuso que los terrenos donados no podrían ser segregados, enajenados, cedidos, transferidos o usados por terceras personas.

...

el . . .15 de septiembre de 2017 el Municipio de Mayagüez mediante comunicación al efecto solicit[ó] nuevamente que se modifiquen las condiciones restrictivas de uso que afectan la propiedad. En esta ocasión, el Municipio de Mayagüez solicita a la Administración que se permita gravar el inmueble en donde ubica el Palacio de Recreación y Deportes, cuya estructura pertenece y es propiedad del Municipio, a través de una corporación municipal creada por el Municipio, al amparo de la Ley de Municipio Autónomos, . . . llamada Mayagüez Economic Development, Inc. (MEDI).

Por Cuanto, desde el año 1976 el Municipio ha estado en posesión del inmueble antes referido, por lo que han transcurrido aproximadamente 41 años desde la fecha de la transferencia de la propiedad hasta el presente. El Municipio de Mayagüez ha construido sobre la propiedad de la Administración, el Palacio de Recreación y Deportes de Mayagüez, con fondos propios. Con la construcción de esta obra permanente, el Municipio ha garantizado el uso público del inmueble en cumplimiento con las condiciones restrictivas de uso habidas sobre el mismo. No empece lo anterior, el Municipio al igual que otras tantas entidades gubernamentales, se encuentra pasando por un momento de estrechez económica, razón por la cual tiene la necesidad de [gravar] el inmueble en cuestión.

Por Cuanto, la Administración por su parte, como corporación pública dedicada a promover el desarrollo económico de Puerto Rico, ve con buenos ojos que se libere esta propiedad de la prohibición de enajenar, de modo que la misma pueda ser utilizada en garantía por el Municipio, a fin de que éste pueda tener capacidad económica para incentivar su economía. El resto de las condiciones restrictivas de uso quedarían inalteradas, según modificadas por la Junta de Gobierno mediante la Resolución. Núm. 1981, supra.

Por Cuanto, Resuélvase por la Junta de Gobierno de la Administración de Terrenos autorizar a la Directora Ejecutiva a modificar las condiciones restrictivas de uso que rigen los predios cedidos mediante la referida Escritura Núm.

25, para permitir que en adelante la propiedad pueda ser enajenada y utilizada para uso de instalaciones recreativas, deportivas o usos comerciales relacionados. Además, se [autoriza] a suscribir y otorgar cualquier documento o instrumento público que resulte necesario, para hacer modificar, hacer constar y/o establecer las condiciones restrictivas de uso que regirán en lo sucesivo a la propiedad.

29. La autorización para modificar las condiciones restrictivas por parte de la Administración de Terrenos es prospectiva.

30. El 18 de diciembre de 2017, Capital Title Services, Inc., ("Capital"), emitió un Estudio de Título para la Cooperativa relacionado con la Finca Número 32,046, inscrita al folio 264 del tomo 1057 de Mayagüez, Registro de la Propiedad de Puerto Rico, Sección de Mayagüez, el cual está relacionado con la Parcela E6(1), del cual se desprende que el referido predio "consta inscrito a favor de Municipio de Mayagüez, cuya entidad lo adquirió por cesión de la Administración de Terrenos de Puerto Rico, sin expresar valor, mediante la escritura número 25, otorgada en San Juan, el día 30 de diciembre de 1976, ante el notario Rafael J. Arrillaga, finca número 32046, inscripción 1a [y en cuanto a las cargas y gravámenes] ...por su procedencia: libre de cargas. Por sí: libre de cargas."

31. Con fecha del 10 de enero de 2018, la Administración de Terrenos obtuvo un Estudio de Título de Milagros S. Mercado Urbina ("Mercado Urbina"), Investigadora de Títulos de la Administración de Terrenos, que expone que la Escritura 9 de transferencia de titularidad de la Finca 32046 ("E-6(1)") a MEDI y la Escritura 42 de hipoteca, habían sido presentadas en el Registro de la Propiedad indicando que la Finca 32046 y demás parcelas cedidas al Municipio por la Administración de Terrenos mediante la Escritura 25, "...no podrían ser segregadas, vendidas, arrendadas, enajenadas, cedidas, o en forma alguna transferidas o usadas por terceras personas."

32. El referido Estudio de Título de Mercado Urbina también refleja que, el 15 de agosto de 2017, MEDI había otorgado la Escritura 42, mediante la cual había hipotecado la finca 32,046 a favor de la Cooperativa, presentando dicha Escritura 42 en el Registro de la Propiedad el 16 de agosto de 2017.

33. El 12 de febrero de 2018, la Escritura 9 fue inscrita como la 2da inscripción sobre la Finca Número 32046.

34. El 21 de febrero de 2018, la Administración de Terrenos y el Municipio, otorgaron la Escritura Núm. 1 sobre Modificación de Condiciones Restrictivas ("Escritura 1"), autorizada por la notario público Maytte Texidor López, la cual fue presentada en el Registro de la Propiedad el 15 de marzo de 2018.

35. La comparecencia del vicealcalde del Municipio en la Escritura 1, se da por virtud de la Resolución 79, que autorizó al Alcalde o al funcionario que éste designe, a otorgar con la Administración, la escritura de modificación de condiciones restrictivas contenidas en la Escritura 25.

36. En la Escritura 1 se expresó que, "a solicitud del Municipio, la Junta de Gobierno de la Administración [de Terrenos], mediante la Resolución dos mil sesenta y cinco (2065) del siete (7) de diciembre de dos mil diecisiete (2017), determinó . . . modificar las condiciones restrictivas de uso que rigen los predios cedidos [a través de la Escritura Núm. 25 de Segregación, Cesión y Traspaso mediante Donación], . . . para permitir que en adelante la propiedad pueda ser enajenada y utilizada para uso de instalaciones recreativas, deportivas o usos comerciales relacionados."

37. A través de la Escritura 1, se consignó que "[l]a Primera Parte [la Administración de Terrenos] reconoce que tiene conocimiento de que el Municipio es propietario, a través de una corporación municipal creada por el Municipio, al amparo de la Ley de Municipios Autónomos . . ., llamada

Mayagüez Economic Development, Inc. del "Palacio de Recreación y Deportes", una estructura que obra erigida sobre el inmueble descrito en el expositivo PRIMERO de esta escritura [la Finca 32046]."

38. En la Escritura 1 se expresó que dicha escritura fue otorgada "para modificar las condiciones restrictivas impuestas por la Escritura Número Veinticinco (25) a los efectos de que la propiedad descrita en el expositivo PRIMERO [la Finca 32046] pueda ser enajenada y gravada, así como utilizada para uso de instalaciones recreativas, deportivas o usos comerciales relacionados."

39. El 16 de diciembre de 2019, el Departamento de Justicia, Registro Inmobiliario Digital, emitió una Certificación Registral de la Finca 32046, que establece: "La parcela cedida no podrá ser segregada, enajenada, vendida, arrendada, cedida o en forma alguna transferida o usada por terceras personas, según inscripción 1."

40. El 22 de enero de 2020, la Registradora de la Propiedad de la Sección de Mayagüez, emitió una certificación, la cual fue actualizada el 8 de enero de 2024, en la que expresó la descripción de la Finca Número 32046, según se detalló en [la] Escritura 9, y consignó, que el titular inscrito de la Finca Número 32046 y las edificaciones lo era MEDI, quien adquirió por cesión efectuada en ese instrumento público.

41. El 10 de agosto de 2021, la Escritura 1, fue inscrita mediante la nota marginal 2.1, sobre la Finca 32046, por la Registradora Beatriz Vélez Ruiz. (Notas y énfasis omitidos.)

Sobre tales bases, el foro primario determinó que no existen controversias sobre hechos materiales relacionados al Palacio de Mayagüez, la Escritura Núm. 9 y la Escritura Núm. 42. Hizo constar que ambas partes sustentaron sus posturas en los mismos documentos, sin embargo, invocaron doctrinas distintas. En particular, la Cooperativa señaló la presunta nulidad de la prohibición de enajenar que emana de la Escritura Núm. 25, mientras que, el Municipio reclamó la nulidad de las Escrituras Números 9 y 42. Justipreciado lo antes, el foro primario coincidió con la postura del Municipio. Además, desestimó con perjuicio las reclamaciones en cuanto al Municipio y MEDI.

Inconforme con la *Sentencia Parcial* impugnada, la Cooperativa presenta el recurso de apelación de epígrafe en el cual le imputa al foro primario la comisión de los siguientes errores:

Erró el TPI al decretar la nulidad de la Escritura Núm. 9 sobre cesión y la Escritura Núm. 42 sobre hipoteca, al fundamentarse en la existencia de una prohibición de disponer contenida en la Escritura Núm. 25, que conforme al Artículo 714(2) del Código Civil de 1930 es nula por ser perpetua. Por ello, erró igualmente, al no decretar la nulidad de la prohibición de disponer inscrita sobre la Finca 32046 en el Registro de la Propiedad.

Erró el TPI (1) al no determinar que el Municipio no tenía legitimación para solicitar remedios por el incumplimiento de la Escritura Núm. 25, (2) al no resolver que esas prohibiciones se extinguieron, y (3) al afirmar que las prohibiciones estaban basadas en la Ley Orgánica de esa entidad.

Erró el TPI al clasificar la Finca 32046 como un bien de dominio público, ignorando el uso restringido y la naturaleza patrimonial del inmueble, conforme al precedente establecido en *Gobierno de la Capital v. Consejo Ejecutivo,* 63 D.P.R. 434, 459 (1944), y al concluir, que el Municipio no cumplió con los procesos legales establecidos en el Artículo 9.005 de la Ley de Municipios Autónomos al transferir la Finca 32046 a MEDI mediante la Escritura Núm. 9.

Erró el TPI al desestimar, sin que esos asuntos estuvieran sometidos ante su consideración, la totalidad de la demanda en contra de MEDI y de Municipio, pretiriendo, que la Cooperativa aseveró en su demanda hechos demostrativos que justifican la concesión de remedios expresamente solicitados en contra de esas partes.

En su alegato, el Municipio expone que, son válidas las condiciones restrictivas que impuso la Administración de Terrenos mediante la Escritura Núm. 25. Detalla que, la referida escritura fue debidamente inscrita en el Registro de la Propiedad -al cual no logran acceso los derechos personales-, con el objetivo de tener efecto *erga omnes* y de asegurar su destino como bien de dominio público. Aduce que, era necesaria la actuación de la Administración de Terrenos para modificar o eliminar tales condiciones lo cual ocurrió, de manera prospectiva, el 21 de febrero de 2018, mediante la Escritura Núm. 1, suscrita entre la Administración de Terrenos y el Municipio. Asegura que, la Administración de Terrenos nunca realizó un acto de desafectación que cumpliese con el Artículo 9.001 de la entonces vigente Ley Núm. 81-1991, Ley de Municipios Autónomos de Puerto Rico, 21 LPRA sec. 4451,[15] y que resultara en que la Parcela E-6(1) en donde ubica el Palacio de Mayagüez perdiese la clasificación de dominio público que ostentaba.

Asimismo, el Municipio aduce que, el hecho de que el edificio esté sujeto a las condiciones restrictivas no permite que se

---

[15] Cabe puntualizar que, la citada Ley Núm. 81 fue derogada por la Ley Núm. 107-2020, conocida como el Código Municipal de Puerto Rico, 21 LPRA secs. 7001 *et seq.* Sin embargo, es la legislación aplicable a los hechos del presente caso.

hipoteque. A su entender, el planteamiento de la Cooperativa no cambia la naturaleza del edificio, por lo que, sigue siendo un bien de dominio público que no está sujeto al tráfico comercial y que no puede ser enajenado, ni embargado.

Por último, observamos que el Municipio incluye argumentos que corresponden a MEDI. No obstante, plantea que el foro primario no incidió al desestimar la totalidad de la demanda sobre ambas partes. En particular señala que, es incorrecto -como cuestión de derecho- imponerle solidaridad al Municipio cuando las actuaciones que dieron base a tal reclamo de daños fueron ejercidas por el señor José Guillermo Rodríguez Rodríguez, en calidad de funcionario de MEDI y de MEDI Films. Lo antes, por virtud del Artículo 2.004(t) de la Ley Núm. 81-1991, 21 LPRA sec. 4054(t), el cual establece que, "[e]n ningún momento, el Municipio responderá por reclamaciones que se lleven a cabo en contra de la corporación municipal con fines de lucro una vez creada." Añade que, la Cooperativa está impedida de reclamar daños en contra del Municipio por esta no haber acreditado cumplimiento con la notificación previa que requiere el Artículo 15.005 de la Ley Núm. 81-1991, 21 LPRA sec. 4705, en acciones de daños y perjuicios.

Por su parte, MEDI y MEDI Films comparecen, el 2 de junio de 2025, mediante su alegato en oposición. Nos plantean que, el objeto de la transacción es nulo *ab initio,* que está plagado de ilegalidades que culminaron en la convicción criminal de varias personas que participaron en el esquema. Reiteran su postura en las presuntas omisiones de la Cooperativa que contribuyeron a la consumación de una transacción viciada. Particularizan el tracto sucesivo correspondiente a las escrituras en controversia y destacan que las condiciones restrictivas continúan surtiendo efectos jurídicos plenos. Argumentan que el TPI actuó correctamente al no

posponer la adjudicación de las mociones dispositivas, habiendo resuelto la totalidad de las controversias.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II.**

**A. Sentencia Sumaria**

El mecanismo de sentencia sumaria está codificado en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36. *Jiménez Soto y otros v. Carolina Catering Corp. y otros,* 2025 TSPR 3, resuelto el 14 de enero de 2025. Cabe señalar que, esta herramienta permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no existe duda sobre los hechos esenciales y se cuenta con la evidencia necesaria, de manera que, solo resta aplicar el derecho. *Íd.*; *Consejo de Titulares del Condominio Millennium v. Rocca Development Corp., et als.,* 2025 TSPR 6, resuelto el 15 de enero de 2025. Este cauce sumario -invocable tanto por la parte reclamante como por quien se defiende de una reclamación- resulta beneficioso para el tribunal y para las partes, pues agiliza el proceso judicial mientras, simultáneamente, provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Jiménez Soto y otros v. Carolina Catering Corp. y otros,* supra.

Como se sabe, procede dictar sentencia sumaria si se desprende de las alegaciones, deposiciones, declaraciones juradas, contestaciones a interrogatorios, admisiones ofrecidas, entre otros, que no existe controversia real sustancial sobre un hecho esencial y pertinente, y siempre que el derecho aplicable así lo justifique. *Consejo de Titulares del Condominio Millennium v. Rocca Development Corp., et als.,* supra. De manera que, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de

su causa de acción. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro,* 2025 TSPR 1, resuelto el 7 de enero de 2025.

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. *Oriental Bank v. Caballero García,* 212 DPR 671, 679 (2023). Véase, además, la Regla 36.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. Si el promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 111 (2015).

Además, el promovente de una solicitud de sentencia sumaria ha de acompañar su petitorio con prueba de la cual surja preponderantemente la ausencia de controversias sobre los hechos medulares del caso. *Birriel Colón v. Econo y otro,* 213 DPR 80 (2023). Es un hecho medular el que puede afectar el resultado de la reclamación, conforme al derecho sustantivo aplicable. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro,* supra.

Cabe destacar que, la parte que desafía una moción de sentencia sumaria no puede descansar en las aseveraciones o

negaciones consignadas en su alegación. *Íd.*; *León Torres v. Rivera Lebrón,* 204 DPR 20, 43 (2020). Por el contrario, la Regla 36.3(c) de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(c), obliga a quien se opone a que se declare con lugar esta solicitud a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *León Torres v. Rivera Lebrón,* supra. A esos efectos, deberá sustentar con evidencia sustancial los hechos materiales que entiende están en disputa. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro,* supra.

Por ello, en la oposición a una solicitud de sentencia sumaria, el promovido debe detallar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos, deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la antes citada Regla 36.3 de Procedimiento Civil. *Íd.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.*

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por el promovente. *E.L.A. v. Cole,* 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues sólo procede si bajo ningún supuesto de hechos prevalece el promovido. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia y ser consciente en

todo momento que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra*,* pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Cruz, López v. Casa Bella y otros,* 213 DPR 980 (2024). Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens,* 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.*

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas,* supra, págs. 118-119. En particular, nuestro más Alto Foro señaló que:

> [...] el Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, los foros apelativos nos encontramos en la misma posición que el Tribunal de Primera Instancia y

utilizamos los mismos criterios para evaluar la procedencia de una sentencia sumaria. *Banco Popular de Puerto Rico v. Cable Media of Puerto Rico, Inc. y otro,* supra. Por ello, nuestra revisión es una *de novo*, y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra*, y su jurisprudencia interpretativa. *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *Acevedo y otros v. Depto. Hacienda y otros,* 212 DPR 335, 352 (2023).

### III.

En su recurso, la Cooperativa cuestiona en los primeros tres señalamientos de error, la nulidad de las Escrituras Números 9 y 42, el alcance de la prohibición de enajenar que emana de la Escritura Núm. 25 y la clasificación de la Finca 32046 como bien de dominio público. Por su estrecha relación entre sí, los discutiremos conjuntamente. Como cuarto error, impugna la determinación del foro primario de desestimar -en su totalidad- la reclamación en cuanto al Municipio y MEDI, obviando que subsisten otras obligaciones contractuales incumplidas que así lo impiden.

Tal cual expresamos anteriormente, en virtud de la norma impuesta por el Alto Foro en *Meléndez González v. M. Cuebas, Inc.,* supra, debemos revisar *de novo* la *Moción de Sentencia Sumaria Parcial* que instó la Cooperativa, sus respectivas oposiciones, así como, el petitorio sumario del Municipio. Lo antes, a los efectos de evaluar si las partes cumplieron con los requisitos de forma que dispone la Regla 36 de las Reglas de Procedimiento Civil, *supra.*

Realizado el análisis de rigor constatamos que, en sus respectivos petitorios sumarios, la Cooperativa y el Municipio dieron cumplimiento a las formalidades de la Regla 36.3(a) de Procedimiento Civil, *supra*. Incluso, al oponerse, el Municipio

observó los requisitos que establece la Regla 36.3(b) de Procedimiento Civil, *supra.*

Por el contrario, vemos que MEDI y MEDI Films no cumplieron con las formalidades de la citada Regla 36.3(b), al oponerse al petitorio sumario de la Cooperativa. En particular, no citaron los párrafos que pretenden controvertir, según los enumeró la Cooperativa, ni detallaron la evidencia admisible que sustenta su impugnación, con la página o sección correspondiente. Se limitaron a exponer que existe controversia de hecho y de derecho en cuanto a "los eventos, la validez y legalidad del traspaso de la Parcela E-6(1) conjuntamente con la estructura enclavada, es decir, con el Palacio del Deporte del Municipio de Mayagüez a MEDI."[16] Al así actuar, y a tenor de la normativa aplicable, MEDI y MEDI Films se arriesgaron a que el TPI considerara los hechos propuestos por la Cooperativa como incontrovertidos y a que dictara sentencia sumariamente en su contra, si procede en derecho. Regla 36.3(c) de las Reglas de Procedimiento Civil; *León Torres v. Rivera Lebrón,* supra.

Superado lo anterior y luego de examinar sosegadamente el recurso, los alegatos de las partes apeladas y la extensa prueba documental que forma parte del apéndice ante nuestra consideración, constatamos que, el foro primario actuó correctamente al dictaminar que no existen hechos medulares en controversia y al decretar la nulidad de las Escrituras Números 9 y 42. Como parte de su análisis, el TPI resumió en la siguiente tabla las fechas y los eventos significativos, en orden cronológico, la cual acogemos para un mejor entendimiento de lo que hoy resolvemos:

| Escritura 25 de 30 de diciembre de 1976 | La Administración de Terrenos cede y traspasa al Municipio las Parcelas A y B, E-7, E-2 y E-6(1), sujeto a condiciones restrictivas a los efectos de que su uso sea para facilidades recreativas y la Parcela A y B para estacionamiento al disponer que dichas parcelas no podrán, en modo alguno, ser segregadas, enajenadas, vendidas, arrendadas, cedidas o de forma alguna transferidas o usadas por terceras personas. |
|---|---|

---

[16] Apéndice, pág. 1616.

| | |
|---|---|
| Resolución 1981 de 18 de marzo de 2016 | La Administración de Terrenos aprobó la Resolución Núm. 1981 a los fines de modificar las condiciones restrictivas de uso que rigen el predio cedido mediante la referida Escritura Núm. 25, para permitir que en adelante la propiedad pueda ser utilizada para usos instalaciones recreativas, deportivas o usos comerciales relacionados. Así mismo, autorizó al Director Ejecutivo a otorgar todos los instrumentos legales necesarios para formalizar la referida modificación. |
| Resolución 79 de 18 de noviembre de 2016 | La Legislatura Municipal del Municipio aprueba la Resolución 79, para otorgar con la Administración de Terrenos, la escritura de modificación de condiciones restrictivas de las Parcelas "E-8" y "E-0", contenidas en la Escritura 25. Dicha Resolución no menciona, ni autoriza la modificación para la Parcela "E6(1)," que es donde ubica el Palacio. |
| Escritura 9 de 31 de enero de 2017 | El Municipio y MEDI otorgan Escritura 9, para ceder la Parcela E-6(1), Finca [32046] a MEDI. Dicha Escritura fue presentada en el Registro de la Propiedad el 4 febrero de 2017. |
| Escritura 42 de 16 de agosto de 2017 | MEDI suscribió pagaré hipotecario por $10,000,000 sobre el Palacio y suscribió Escritura 42 en la que constituye una Hipoteca sobre éste. Dicha Escritura fue presentada en el Registro de la Propiedad el 16 de agosto de 2017. |
| 15 de septiembre de 2017 | El Municipio solicitó a la Administración de Terrenos que modifique condiciones restrictivas de uso que afectan la propiedad a los fines que se le permita gravar el inmueble en donde ubica el Palacio de Recreación y Deportes. |
| Resolución 42 de 21 de noviembre de 2017 | La Legislatura Municipal del Municipio aprueba Resolución 42 para ratificar las escrituras 9 y 42 y el Acta Aclaratoria 4 y autorizando a transferir a MEDI las Parcelas E-8 y E-0 con el Palacio. |
| Resolución 2065 de 7 de diciembre de 2017 | La Administración de Terrenos aprueba la Resolución 2065 para modificar las condiciones restrictivas de las Parcelas de la Escritura 25 y permitir en adelante, la enajenación, gravámenes, etc. |
| Escritura 1 de 21 de febrero de 2018 | La Administración de Terrenos y el Municipio otorgan la Escritura 1, la cual se presentó en el Registro de la Propiedad el 15 de marzo de 2018 y se registró el 10 de agosto de 2021. |

Sustentado en lo anterior, el TPI consideró que, todas las fincas que la Administración de Terrenos traspasó al Municipio -a través de la Escritura Núm. 25- estaban sujetas a condiciones restrictivas que limitaban su uso a facilidades recreativas, sin poder estas ser segregadas, enajenadas, vendidas, arrendadas, cedidas o de forma alguna transferidas o usadas por terceros.[17] En ese sentido, y amparado en el Artículo 2.004 de la Ley Núm. 81-1991, *supra,* el foro primario resolvió que, "mientras estuviesen vigentes las condiciones restrictivas establecidas en la Escritura 25, el Municipio estaba impedido de transferir las parcelas de terrenos

---

[17] Salvo las Parcelas A y B que debían destinarse para estacionamiento.

cedidas a terceros -como lo sería MEDI[-] en virtud de la personalidad jurídica propia conferida por la Ley 81".

Tal cual expuso el TPI en su pronunciamiento, al 31 de enero de 2017, cuando el Municipio cedió a MEDI la Finca 32046, Parcela E-6(1), la Administración de Terrenos no había otorgado la Escritura Núm. 1 (suscrita el 21 de febrero de 2018), a los efectos de, liberar dicho predio de las condiciones restrictivas y de la prohibición de segregar, enajenar, vender, arrendar, ceder, transferir o usar por terceras personas, establecidas desde el año 1976 mediante la Escritura Núm. 25. Entiéndase que, la liberación de las condiciones restrictivas ocurrió *ex post facto.*

Es norma conocida que, la hipoteca es un derecho real que depende para su validez de su inscripción en el Registro de la Propiedad. Artículo 1774 del derogado Código Civil de Puerto Rico de 1930, 31 LPRA sec. 5042. *DLJ Mortgage v. García Ramos,* 207 DPR 28, 54 (2021). Además, y como requisito indispensable para su otorgamiento, la cosa hipotecada debe pertenecer en propiedad a quien la hipoteca y, quien constituya el gravamen, debe tener la libre disposición de sus bienes o estar autorizado legalmente para ello, entre otros requisitos fundamentales. *Íd.*

Según la Cooperativa, las Escrituras Números 9 y 42 son válidas, lo que son nulas son las condiciones restrictivas dispuestas en la Escritura Núm. 25, por su carácter perpetuo. La Cooperativa sustenta su postura en el Artículo 25 de la Ley Núm. 210-2015, Ley del Registro de la Propiedad Inmobiliaria del Estado Libre Asociado de Puerto Rico, 30 LPRA sec. 6040, en el Artículo 714(2) del entonces vigente Código Civil de Puerto Rico de 1930, 31 LPRA sec. 2312(2), y en interpretaciones sobre la materia realizadas en el Derecho Español.

En particular, la Cooperativa expone que, a tenor del Artículo 714(2) del hoy derogado Código Civil, *supra,* las prohibiciones

perpetuas de enajenar no surtirán efecto. A lo anterior añade que, el Palacio de Mayagüez es un bien patrimonial del Municipio, no un bien público, en la medida en que, no puede ser utilizado libremente por el público en general.[18] Lo antes para establecer que no requería de un acto de desafectación para alterar la clasificación jurídica del terreno y para sustentar la presunta validez de la transferencia y de la hipoteca constituidas mediante las Escrituras Números 9 y 42.

Sin embargo, tal cual estableció el foro primario, el citado Artículo 714(2) es un precepto enmarcado dentro del derecho sucesorio. Por tanto, esta disposición no aplica a los bienes de dominio público, en el ámbito del derecho real o contractual. Según lo define el Artículo 9.001 de la entonces vigente Ley Núm. 81-1991, 21 LPRA sec. 4451, "[s]on bienes de dominio público **los destinados a un uso o servicio público,** tales como las plazas, calles, avenidas, paseos y obras públicas, de servicio general sufragadas por el municipio con fondos públicos. Los bienes de dominio público son inalienables, inembargables y no están sujeto a contribución alguna. Los demás bienes de los municipios son patrimoniales [...]" (Énfasis nuestro.)

La Cooperativa añade que, según el Artículo 25 de la Ley Núm. 210-2015, *supra,* las prohibiciones de disponer o enajenar impuestas por un donante, son inscribibles siempre y cuando la legislación vigente reconozca su validez. A su entender, la legislación vigente no reconoce la validez de la prohibición de enajenar que surge de la Escritura Núm. 25, sustentado en la interpretación conferida en el Derecho Español, que establece que, la prohibición de disponer debe ser temporal para ser válida. El razonamiento de la Cooperativa no nos persuade.

Por definición, las condiciones restrictivas limitan el uso de determinados predios e imponen cargas y gravámenes obligatorios

---

[18] Vélez Torres, *Curso de Derecho Civil, Derechos Reales*, 1997, Tomo II, pág. 42.

para presentes y futuros adquirentes. *SLG Fernández-Bernal v. RAD-MAN et al.,* 208 DPR 310, 326 (2021). Como requisito para su validez, el Alto Foro ha delineado, entre otros, que las condiciones restrictivas se inscriban en el Registro de la Propiedad, luego de lo cual, constituye un derecho real oponible *erga omnes. Íd.*, pág. 327. De manera que, quien adquiere una propiedad gravada, a sabiendas de las restricciones que surgen del Registro de la Propiedad, acepta someterse a estas. *Íd.*, pág. 328.

Coincidimos con el foro primario en cuanto a que, las condiciones restrictivas objeto de este pleito fueron válidamente establecidas, en virtud de los poderes conferidos a la Administración de Terrenos por la Ley Núm. 13 de 16 de mayo de 1962, Ley de la Administración de Terrenos de Puerto Rico, según enmendada, (Ley Núm. 13), 23 LPRA sec. 311 *et seq.* Nos explicamos.

Surge de la Exposición de Motivos de la Ley Núm. 13, *supra,* que el legislador otorgó a la Administración de Terrenos el poder para establecer todas las condiciones y limitaciones necesarias o convenientes en cuanto a su uso, dirigidas a "[…] preservar la belleza de los parajes destinados a uso del público, incluyendo las áreas verdes y los parques públicos; y facilitar el uso y desarrollo de áreas reservadas para proyectos de interés público, especialmente los relacionados con la salud, la seguridad y el bienestar de los habitantes […]" Análogamente, el inciso (z) del Artículo 7 de la Ley Núm. 13, 23 LPRA sec. 311f(z), faculta a la Administración de Terrenos a disponer las condiciones y limitaciones que entienda necesarias y convenientes para asegurar que se cumpla con los objetivos de esta legislación.

En virtud de tales poderes, la Administración de Terrenos donó al Municipio varias parcelas de terreno, entre ellas, las identificadas como E-0, E-8, E-6 y E-6(1) y dispuso que estas serían destinadas total y exclusivamente para facilidades recreativas.

Además, prohibió expresamente que estas fuesen segregadas, enajenadas, vendidas, arrendadas, cedidas "o en forma alguna transferidas o usadas por terceras personas."[19]

Por último, la Cooperativa argumenta que, mediante la Resolución Núm. 42, la Legislatura Municipal ratificó: (1) la transferencia del Palacio de Mayagüez libre de restricciones, efectuada por el Municipio mediante la Escritura Núm. 9; (2) la garantía hipotecaria constituida a través de la Escritura Núm. 42 y (3) el Acta Aclaratoria Núm. 4 que otorgó el señor José Guillermo Rodríguez Rodríguez, en calidad de Alcalde de Mayagüez y Presidente de MEDI, del cual surge un narrativo notarial del proceso de transferencia del Palacio de Mayagüez y su financiamiento. No tiene razón.

Tal cual dispuso el TPI en el dictamen apelado, la Legislatura Municipal carece de facultad para convalidar y dar eficacia a un acuerdo nulo. Primeramente, a tenor del Artículo 35 de la Ley Núm. 210-2015, 30 LPRA sec. 6050, un asiento de inscripción no tiene el efecto de convalidar actos o contratos nulos. Además, tal cual resolvió nuestro Tribunal Supremo en *Ríos v. Municipio de Isabela,* 159 DPR 839 (2003), la mera aprobación de una resolución municipal no puede legalizar un acuerdo ultra vires o un acto jurídico inexistente.

La Cooperativa invoca la Resolución Núm. 79, suscrita por la Legislatura Municipal, el 18 de noviembre de 2016, para derrotar el argumento de nulidad de la Escritura Núm. 9, e intentar establecer que, con ella, la Legislatura Municipal avaló la transferencia del Palacio de Mayagüez a favor de MEDI. Ahora bien, la Resolución Núm. 79 expresamente dispone que su propósito es "autorizar al alcalde o al funcionario que este designe a otorgar la escritura de eliminación de condiciones restrictivas a otorgarse por el Municipio

---

[19] Apéndice, pág. 574, Escritura Núm. 25, "QUINTO" acápite.

de Mayagüez y la Administración de Terrenos de Puerto Rico en relación con las Parcelas E-8 y E-0 que el Municipio adquiera conforme a la Escritura 25 de Segregación, Cesión y Traspaso Mediante Donación de 30 de diciembre de 1976, otorgada ante el Notario Rafael F. Arrillaga; y para otros fines."[20]

De lo antes transcrito surge claramente que, la Legislatura Municipal limitó el alcance de esta resolución a las Parcelas E-8 y E-0. Constatamos de su contenido que, en sus cláusulas, no hizo referencia alguna ni a la Parcela E-6(1), ni al Palacio de Mayagüez. Cabe señalar que, surge de la Escritura Núm. 25 que, la Parcela E-6(1) es independiente de las Parcelas E-8 y E-0, y es donde ubica el Palacio de Mayagüez, tal cual lo acredita la Escritura Núm. 9.

Obsérvese que, la Legislatura Municipal aprobó posteriormente la Resolución Núm. 42, el 21 de noviembre de 2017, entre otros propósitos, para "aclarar los alcances de la Resolución Número 79, Serie 2016-2017 [...]"[21] A esos efectos, surge de la Resolución Núm. 42, lo siguiente:

> [h]abiendo autorizado esta Legislatura Municipal la transferencia del Palacio de Recreación y Deportes Germán "Wilkins" Vélez, mediante la Ordenanza Número 27, Serie 2013-2014, y habiéndose otorgado una Escritura de Edificación y Transferencia, Escritura Número 9 del 31 de enero de 2017, es menester y para cumplir con todos los propósitos y objetivos del Registro de la Propiedad que esta Legislatura Municipal ratifique y para todos los efectos jurídicos, aclare la Resolución Número 79, Serie 2016-2017, cede, autoriza al Honorable Alcalde o al Funcionario que éste designe a ceder la propiedad inmueble conocida como Palacio de Recreación y Deportes Germán "Wilkins" Vélez y sus terrenos comprendidos a Mayagüez Economic Development, Inc., sin ningún tipo de restricción y condición, y la transfiere libremente de cargas y gravámenes. Apéndice, págs. 220-221.

Si bien es cierto que la Legislatura Municipal aprobó la Resolución Núm. 42 en su intento por validar la transferencia del Palacio de Mayagüez y liberarla de sus gravámenes, su aprobación no puede surtir efecto retroactivo. Análogamente, la Junta de

---

[20] Apéndice, pág. 1742.
[21] Apéndice, pág. 218.

Gobierno de la Administración de Terrenos emitió, el 7 de diciembre de 2017, la Resolución Núm. 2065 con el objetivo de modificar las condiciones restrictivas de uso de los predios cedidos mediante la Escritura Núm. 25. Sin embargo, surge de la propia Resolución Núm. 2065 que ello regiría "en lo sucesivo",[22] sin contar que, ya para esa fecha, se había suscrito la Escritura Núm. 9.

A partir del traspaso ilegal del Palacio de Mayagüez, mediante la Escritura Núm. 9, todas las transacciones posteriores, relacionadas a dicha transferencia, son igualmente nulas, por lo cual, no tienen valor o efecto jurídico alguno. Cabe puntualizar que, la Ordenanza Núm. 23 autorizó a MEDI a generar ingresos a favor del Municipio, mientras que, la Ordenanza Núm. 25 modificó la composición de la Junta de Directores de MEDI.[23] Si bien es cierto que, la Ordenanza Núm. 27, aprobada el 7 de abril de 2014, autorizó al Alcalde del Municipio a "otorgar todos aquellos acuerdos y/o contratos necesarios y que entiendan convenientes en la consecución de los propósitos señalados [...] ya sean públicos o privados, donde se pueda enajenar los bienes, vender, transferir, segregar predios, constituir servidumbres, hipotecar, subordinar hipotecas [...] en beneficio de la Corporación 'Mayagüez Economic Development, Inc.",[24] lo antes no puede tener el efecto de modificar las condiciones restrictivas establecidas mediante la Escritura Núm. 25. Convenimos con el TPI en que, las facultades conferidas por medio de la Ordenanza Núm. 27 son de carácter genérico, no están relacionadas con alguna propiedad o activo municipal particular, ni acreditan "la justificación de la necesidad y conveniencia pública de tal cambio o alteración", tal cual lo exige el Artículo 9.001 de la entonces vigente Ley Núm. 81-1991, *supra.* Sustentado en lo anterior concluimos que, el foro primario no incidió en su análisis.

---

[22] Apéndice, pág. 569.
[23] Apéndice, págs. 155 y 163.
[24] Apéndice, págs. 170-171.

Constatamos de los documentos que obran en el apéndice que, no existe una ordenanza o resolución de la Legislatura Municipal que modifique la clasificación jurídica del Palacio de Mayagüez previo al otorgamiento de la Escritura Núm. 9. Entiéndase que, a la fecha en que el Municipio pretendió transferir a MEDI la titularidad de la Parcela E-6(1) y los activos que componen el Palacio de Mayagüez, el referido inmueble era un bien de dominio público municipal, con naturaleza inembargable e inajenable. En atención a lo anterior, tampoco tal inmueble podía ser hipotecado.

Sobre tales bases, y conforme a la normativa antes expuesta, concluimos que la Escritura Núm. 9 y la Escritura Núm. 42 son nulas y, por tanto, nunca surtieron efecto alguno. Los actos realizados por la Asamblea Municipal dirigidos a ratificar lo estipulado en tales escrituras fueron sin lugar a duda inoficiosos. En su consecuencia, MEDI nunca advino titular de la Parcela E-6(1), ni de los edificios y los activos que componen el Palacio de Mayagüez. El foro primario actuó conforme a derecho al decretar la nulidad de las Escrituras Números 9 y 42, y al ordenar la cancelación de los asientos correspondientes a la transferencia de titularidad y al gravamen hipotecario. El primer, segundo y tercer error no se cometieron.

Según expusimos previamente, en el cuarto señalamiento de error, la Cooperativa impugna la determinación del foro primario de desestimar las causas de acción en contra del Municipio y de MEDI, en ausencia de una solicitud a tales efectos, y a pesar de que expuso en su reclamación hechos demostrativos que justifican la concesión de un remedio en contra de estos.

Cabe puntualizar que, tras bifurcar los procesos, el TPI determinó que, en esta etapa de los procedimientos, atendería únicamente la validez y legalidad del traspaso de la Parcela E-6(1), entiéndase, de las Escrituras Números 9 y 42. Decretada la nulidad

de las mencionadas escrituras, mediante la *Sentencia Parcial* objeto de este recurso, quedan pendientes de dilucidar ante el TPI las restantes causas de acción objeto de este pleito, entre otras: cobro de dinero bajo el contrato de préstamo, incumplimiento de las obligaciones contractuales, solidaridad contractual, obligaciones fiduciarias, daños y perjuicios.

Según expusimos en el tracto procesal, el Municipio se opuso al petitorio sumario de la Cooperativa y, a su vez, instó su propia solicitud de sentencia sumaria. Como remedio, suplicó la nulidad de las Escrituras Números 9 y 42 y la cancelación de los asientos registrales correspondientes. Concedido lo antes mediante el dictamen apelado, y en ausencia de otra reclamación en contra del Municipio, el foro primario actuó correctamente al desestimar con perjuicio la reclamación en cuanto a dicha parte. Cabe recordar que, el Municipio tiene personalidad jurídica propia e independiente de MEDI. Además, las reclamaciones que subsisten guardan relación con otras obligaciones contractuales que no fueron suscritas por el Municipio.

Ahora bien, el foro primario se extralimitó al decretar la desestimación con perjuicio en contra de MEDI, en esta etapa de los procesos. De una lectura de los hechos incontrovertidos que surgen del dictamen apelado observamos que, el foro primario se limitó a consignar únicamente lo relacionado al Palacio de Mayagüez, la Escritura Núm. 9 y la Escritura Núm. 42. En su consecuencia el TPI no consideró hechos medulares atinentes a las demás causas de acción y asuntos en controversia pendientes contra MEDI y MEDI Films, quienes figuran como entidades jurídicas independientes del Municipio. A modo de ejemplo, surge del expediente que, entre los asuntos pendientes de dilucidar ante el TPI están los contratos a favor de la Cooperativa, suscritos por MEDI y MEDI Films, entre ellos: el contrato de préstamo, intitulado *Non-Revolving Line of Credit*

*Loan Agreement;* el Contrato de Préstamo Comercial; el Pagaré Operacional "Note"; y el *Mortgage Note Pledge and Security Agreement.* A lo anterior se añade que, MEDI entregó a la Cooperativa -en carácter prendario- el Pagaré Hipotecario por la suma de $10,000,000.00, en aseguramiento del pago y del cumplimiento de sus obligaciones bajo el contrato de préstamo.

De lo antes resulta evidente que, tras la bifurcación de los procesos y adjudicada la nulidad de las Escrituras Números 9 y 42, queda pendiente toda reclamación inherente a los mencionados acuerdos, de los cuales formaron parte tanto MEDI como MEDI Films, según las alegaciones de la demanda instada por la Cooperativa. A esos efectos, decretamos que el foro primario desestimó prematuramente la reclamación en contra de MEDI. El cuarto error señalado se cometió, únicamente en cuanto a MEDI.

## IV.

Por los fundamentos antes expuestos, revocamos en parte la *Sentencia Parcial* impugnada, a los únicos fines de dejar sin efecto la desestimación con perjuicio de la reclamación en cuanto a MEDI, y así confirmamos en parte el dictamen apelado. Se devuelve el asunto al foro primario para la continuación de los procedimientos, de conformidad con lo aquí resuelto.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La Juez Barresi Ramos concurre sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones